

# THE ATTORNEY GENERAL

## OF TEXAS

CRAWFORD C. MARTIN
ATTORNEY GENERAL

AUSTIN, TEXAS 78711

March 9, 1967

Honorable J. M. Falkner
Commissioner of Banking
John H. Reagan Building
Austin, Texas

Opinion No. M-39

Re: In the involuntary dissolu-
tion of a Credit Union under
Article 2483, V.C.S., what
difference, if any, would
there be in the classification
and treatment of claims based
on moneys paid in for shares
on the one hand, and based on
deposits made, on the other

Dear Mr. Falkner:

hand, and related questions.

In your request for an opinion on the questions set out
above, you state that a credit union is facing involuntary
liquidation under the provisions of Section 4 of Article 2483,
Vernon's Civil Statutes, and that the claims against it which
you are concerned with grow out of loans from other credit
unions, evidenced by installment promissory notes, as well as
money received from its depositors and stockholders.

You ask:

"(1) What difference, if any, would there be
in the classification and treatment of claims based
on monies paid in for shares, on the one hand, and
based on deposits made, on the other hand? (It has
been suggested that the Legislature intended that
they should be treated equally in all respects by
virtue of the first sentence of Section 1, Article
2462, V.T.C.S.: ' A credit union may receive the
savings of its members in payment for shares or as
deposits.')

"(2) What difference, if any, would there be
in the classification and treatment of claims based
on the money borrowed from other credit unions, on
the one hand, and those claims based on shares and
deposits, on the other hand."

- 184 -

We do not conclude that deposits with the credit union and shares in the ownership in the union "should be treated equally in all respects", as suggested in your query. This would be a departure from well established legal concepts, which will be discussed below, and it is incompatible with the provisions of the statute itself. Section 1 of Article 2483 makes it clear that in the case of voluntary dissolution of an association, the shareholders may not receive any of the proceeds of liquidation until "after debts of the association have been paid". This provision of the statute merely follows the well established principle, stated in Humble Oil & Refining Company v. Blankenburg, 149 Tex. 498, 235 S.W.2d 891, 893 (1951), as follows:

"When a corporation is dissolved, its property becomes the property of its stockholders in proportion to their respective shares, subject, however, to the rights of the creditors of the corporation whose debts must be satisfied out of the corporation property."

The question then arises: Are the rights of the stockholder in cases of involuntary dissolution different from those prescribed by statute in cases of voluntary liquidation of the credit union? Section 4, paragraphs (4) and (5) of Article 2483 plainly authorize the liquidating agent to take possession of the books, records and assets of the credit union, to liquidate the assets, to pass upon all claims, including claims of members owning shares, and "to make distribution and payment to creditors and members as their interest may appear". (Emphasis added.) It further authorizes the liquidator to give notices to creditors and members concerning their rights to present their claims, and then authorizes him to,

". . . from time to time make a ratable dividend on all such claims . . . and, after the assets of such credit union have been liquidated, make further dividends on all claims previously proved or adjusted, . . ."

Section 4, paragraph 6 of the Article provides that upon completion of the liquidation, whether voluntary or involuntary, the Commissioner shall cancel the charter of the credit union; but that the corporate existence of the credit union shall continue for three years, during which time the Commissioner may act on behalf of the credit union to pay the debts and to distribute the assets.

The language of Section 4 presents a serious question. It is susceptible of being construed to mean that stockholders are to share in the assets on a parity with the creditors. For the reasons set out below we construe the phrase "as their interests may appear" to mean "as their respective interest may appear", so that each category of claim may be paid at the time and in the manner provided by law.

It has been held that the word "ratable" means pro rata, as distinguished from equality or equal divisions, and that it implies an unequal division between different persons. Chenoweth v. Nordan and Morris, 171 S.W.2d 386, (Tex. Civ. App. 1947, error ref. w.o.m.).

If the language contained in Section 4 were to be construed to mean that upon the involuntary liquidation of a credit union a stockholder may assert a claim in the assets of a corporation on a parity with depositors and other creditors, it would mean that in the case of an involuntary liquidation the stockholders could assert the same rights as a creditor; whereas, in a voluntary liquidation under Section 1, the stockholders get nothing until the creditors are paid. Furthermore, such a construction of Section 4 would be a complete departure from the basic legal concept of the relationship of stockholders to the corporation. The ultimate control (and ownership) of the corporation is in the stockholders, and to permit them to effect a change in their relationship with the corporation so as to assert their ownership interest as a claim against the corporation in the form of a debt would make possible the use, by majority of the stockholders, of their control of the corporation, to divert or misapply its assets and then assert their full claim to the assets of the corporation on an equal footing with the creditors upon involuntary dissolution.

A problem similar to that involved in your question was involved in the case of In Re Phoenix Hotel Company of Lexington, 83 F.2d 724, (C.C.A. 6th, 1936, certiorari denied 299 U.S. 568). A Kentucky statute authorized corporations to permit the conversion of stocks into bonds and bonds into stocks. In a bankruptcy proceeding, a dispute arose over the priorities of the claims asserted by holders of corporate bonds. This involved an interpretation of the statute. As the Court construed the statute, a conversion of shares into bonds would not amount to a transformation of a stockholder to the position of a creditor. The Court said:

"It is a fundamental rule of corporation law that one cannot be at the same time both a stockholder and a creditor of a corporation in respect to the same funds hazarded in the corporate enterprise. The two relations are antipodal. This principle is not only rooted in sound public policy, but grows out of the very nature of corporations. The assets represented by corporate stock are the basis of its credit, and provide a fund for the payment of its debts. No part of them may be withdrawn for the purpose of retiring shares until debts are paid. Hamlin v. Toledo Railroad Co., 78 F. 664, 36 L.R.A. 826 (C.C.A.6). It may be granted that the state may authorize the creation of securities which though denominated preferred shares are debts of the corporation and to give such debts priority over other debts, since nomenclature is not conclusive as to the essential character of an instrument. Mathews v. Bradford, 70 F. (2d) 77, 78 (C.C.A.6). But to do this is to work a revolutionary change in long accepted principles /¯Vanden Bosch v. Michigan Trust Co., 35 F. (2d) 643 (C.C.A.6)_7, and those who are to be asked to give credit must revise familiar standards of credit. If the Legislature intends such complete upsetting of known standards it may easily use express words to indicate such intent. This is a principle of universal application. (Emphasis added.)

"The 1910 act gives no indication of such revolutionary legislative intent. It is the source of new corporate power. It authorizes the conversion of preferred stock into bonds and bonds into stock, but neither expressly nor by necessary implication does it give to such bonds priority over debts accruing prior to conversion . . . .

". . . Without express or more clearly implied purpose we cannot impute to the Legislature an intent to overturn a doctrine in respect to corporate capital so long and so universally recognized, to permit corporate debts parading as stock to escape the burden of its revenue acts, or the condemnation of its usury laws, or to impair if not wholly destroy corporate credit. All of these consequences must follow if we accept the construction urged upon us. If corporate capital in trust for creditors may at will be translated

to corporate liability whenever clouds appear in the financial heavens, then the asserted purpose of the statute is defeated rather than effectuated, as soon as its implications are understood."

In Vaden Bosch v. Michigan Trust Company, 35 F. (2d) 643, 645 (C.C.A.6, 1929) (cited in the foregoing quotation) the court held that a statute authorizing corporations to make the redemption of preferred stock obligatory did not create a debtor-creditor relationship. The court declared that such a construction of the statute would work a revolutionary change in long-accepted principles and that if the Legislature intended such a complete upsetting of known standards, it could easily have used express words. See also Mathews v. Bradford, 70 F. (2d) 77 (C.C.A.6, 1934); and Galloway v. Michigan Savings and Loan Association, 206 F. 241, 246 (C.C.A.6, 1913), where the court declared that the claimant "could not, at the same time and for the same money, become a general creditor and a certificate holder, so that he would be entitled to pursue and enforce both positions."

Applying these considerations to your question, it appears certain that the Legislature did not intend to create totally different rights for the stockholders of a corporation undergoing involuntary liquidation from the rights of stockholders in a corporation undergoing voluntary liquidation. Moreover, it is altogether unlikely that the Legislature would have intended to permit the stockholders to undergo a change in their relationships with the corporation some time during its transition from solvency to insolvency. In other words, there is no basis to assume that the Legislature intended the stockholders to be transformed into creditors of the corporation by virtue of its financial deterioration.

In our opinion, the provisions of Section 4 authorizing the liquidator "to make distribution and payment to creditors and to members as their interest may appear" must be construed, to mean that the members receive the assets of the corporation at such time and in such amounts as their legal rights may justify, after the debts of the corporation are paid.

The remaining question is whether there is any difference, from the standpoint of priorities, between the claims of the depositors and the claims of the other creditors. We hold that in the absence of valid contractual provisions to the contrary such claims are on a parity and that the depositor is a creditor of the credit union in the same way that the depositor of a ban

or savings and loan association becomes its creditor, and as such is not entitled to any preference over other creditors. Reynolds v. Wilhoit, 149 S.W.2d 780, 782 (Ky. App. 1941); 9 C.J.S. 1020, Banks and Banking, Sec. 530; Galloway v. Michigan Savings and Loan Assn., supra; 12 C.J.S. 538, Building and Loan Associations, Sec. 116.

## S U M M A R Y

In an involuntary liquidation of a credit union, general creditors and depositors would be on a parity and would receive their claims in full prior to any distribution to stockholders.

Very truly yours,

CRAWFORD C. MARTIN
Attorney General of Texas

Prepared by Ralph R. Rash
and J. T. Walker
Assistant Attorneys General

APPROVED:
OPINION COMMITTEE

Hawthorne Phillips, Chairman
W. V. Geppert, Co-Chairman
Ray McGregor
Fielding Early
Malcolm Quick
W. O. Shultz

STAFF LEGAL ASSISTANT
A. J. Carubbi, Jr.